**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 17-20678

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2019

Lyle W. Cayce
Clerk

HALLIBURTON ENERGY SERVICES, INCORPORATED,

    Plaintiff - Appellee

v.

IRONSHORE SPECIALTY INSURANCE COMPANY,

    Defendant – Appellant

-------------------------------------------------------------------------------

Consolidated with 18-20239

HALLIBURTON ENERGY SERVICES, INCORPORATED,

    Plaintiff - Appellant

v.

IRONSHORE SPECIALTY INSURANCE COMPANY,

    Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

No. 17-20678
c/w No. 18-20239

Before STEWART, Chief Judge, and SOUTHWICK and ENGELHARDT, Circuit Judges.

CARL E. STEWART, Chief Judge:

An oil rig caught fire and exploded in Ohio. Statoil USA Onshore Properties operated the rig, Halliburton Energy Services fracked at the rig site, and Ironshore Specialty Insurance Company insured Statoil. Now, all the parties disagree about who is on the financial hook for the damage.

Ironshore paid roughly $12 million to Statoil to cover a portion of the damages, while Halliburton paid nothing. But Ironshore didn't go away quietly—it sent a letter to Halliburton, demanding payment and asserting subrogation rights under the Master Services Agreement ("MSA"), a contract between Statoil and Halliburton. Halliburton responded with this preemptive declaratory judgment action, arguing that it owes nothing under the MSA. Halliburton also tacked on a breach of contract claim, arguing that Ironshore should have indemnified Halliburton. Rather than litigate these issues in federal court, Ironshore sought a private resolution through arbitration.

This case turns on two issues. First, whether the MSA dispute should go to arbitration. And second, whether the court has personal jurisdiction over Ironshore for the remaining breach of contract claim. The district court held that arbitration was not required—Ironshore could not invoke the arbitration clause in the MSA because it waived any subrogation rights. Then, the district court held that it lacked personal jurisdiction over Ironshore and dismissed the case.

We hold that the district court erred when it held that Ironshore waived its subrogation rights under the MSA. We therefore REVERSE its arbitration ruling in appeal No. 17-20678. The district court was correct, however, when it held that it lacked personal jurisdiction over Ironshore. We therefore

2

No. 17-20678
c/w No. 18-20239

AFFIRM the district court's personal jurisdiction ruling in appeal No. 18-20239.

## I. Factual Background & Procedural History

This case centers on an insurance dispute following an explosion and fire on an oil-and-gas rig in Ohio.[1]  The rig at issue was operated by Statoil, which is not a party to this lawsuit; Halliburton fracked at the well; and Ironshore insured Statoil.

Prior to the explosion, Statoil entered into two contracts that form the basis of this dispute.  First, Statoil contracted with the plaintiff, Halliburton.  While operating the rig, Statoil hired Halliburton to perform fracking operations.  They memorialized their relationship in an Onshore Master Services Agreement ("MSA").

The MSA is relevant here because it allocated risk among the parties.  It contained various indemnification provisions, which shifted liability for some accidents to Statoil and others to Halliburton.  In the event of a dispute about these provisions, the MSA required the parties to submit to binding arbitration in Texas.

The MSA contained multiple references to Texas.  The MSA required Halliburton to send invoices to Statoil's Houston address; it contained a Texas-specific indemnity provision; and it required the parties to resolve any disputes in Texas under Texas law.  Halliburton and Statoil also both listed their principal places of business as Houston, Texas.

The second relevant contract is an insurance policy—a Site Pollution Incident Legal Liability Select (or "SPILLS") policy—that Statoil entered into

---

[1] On June 28, 2014, a hydraulic line broke at a well pad, and fluid in the line sprayed onto some nearby hot equipment, causing the explosion.

3

with Ironshore. Under this policy, Ironshore agreed to waive subrogation rights as required by written contract. It also agreed to insure Statoil in accordance with Texas surplus lines laws.

On June 28, 2014, the explosion occurred, spurring a flurry of declaratory judgment actions by Statoil's insurers. The primary lawsuit was filed by one of Statoil's other insurers in Texas. Ironshore was named as a defendant in that action. Ironshore responded by filing its own declaratory judgment action in New York.

Eventually, the insurers settled and agreed to reimburse Statoil for $24 million, with Ironshore paying roughly $12 million. The insurers, however, reserved their rights against each other and agreed to litigate the proper allocation of the settlement amount among themselves in the Texas action. Each insurer reserved the right to argue for the application of any state law.

Following the settlement, Ironshore sent a letter to Halliburton requesting indemnification under the MSA. More specifically, Ironshore asked Halliburton to waive arbitration and negotiate Halliburton's potential liability. The request failed—Halliburton rejected the offer and filed this breach of contract and declaratory judgment action, requesting the district court to hold that (1) Halliburton is an "additional insured" under the SPILLS policy and, therefore, not liable for indemnification; (2) Ironshore breached the SPILLS policy by not defending and indemnifying Halliburton as an additional insured; and (3) Ironshore waived its subrogation rights. Ironshore responded by filing (1) a motion to stay pending arbitration under Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, and (2) a motion to dismiss for lack of personal jurisdiction. The district court ruled on both motions.

The district court first addressed Ironshore's motion to stay pending arbitration. The court denied the motion, holding that Ironshore could not

No. 17-20678
c/w No. 18-20239

compel arbitration because there was no binding arbitration agreement between Ironshore and Halliburton. Ironshore filed an interlocutory appeal of that ruling, which was docketed as case number 17-20678.

After ruling on Ironshore's motion to stay pending arbitration, the district court ruled on Ironshore's motion to dismiss for lack of personal jurisdiction. The court first held that it did not have general jurisdiction over Ironshore because Ironshore did not have any substantial contacts with Texas. It also held that it lacked specific jurisdiction over Ironshore because Ironshore did not have minimum contacts with the forum state. Haliburton appealed, and the appeal was docketed as case number 18-20239. Both cases were then consolidated.

## II.  The District Court's Arbitration Ruling

The district court first addressed whether there was a binding arbitration clause between Ironshore and Halliburton. The court determined that there was not and denied Ironshore's motion to stay pending arbitration. We disagree.

### A.  Background Arbitration Law

This court reviews a district court's ruling on a motion to compel arbitration and stay litigation de novo.[2] *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 476 (5th Cir. 2003) (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257 (5th Cir.

---

[2] We address the arbitration question before turning to personal jurisdiction because Ironshore submitted to the court's personal jurisdiction for the limited purpose of compelling arbitration. This court has definitively held that a defendant can subject itself to the court's jurisdiction for "the limited purpose of compelling arbitration" without waiving challenges to personal jurisdiction for other purposes. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016) (internal citation and quotation marks omitted); *see also Encompass Power Servs., Inc. v. Eng'g & Constr. Co.*, 224 F. App'x 329, 331 (5th Cir. 2007) (unpublished) (per curiam); *PaineWebber, Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 461 (5th Cir. 2001).

No. 17-20678
c/w No. 18-20239

1996)). A district court's interpretation of the scope of an arbitration agreement is also subject to this court's plenary review. *See Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 337 (5th Cir. 2004); *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998).

Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate.[3] *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) ("Neither [section 2 nor 3 of the FAA] purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)."); *see also Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018); *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011). Here, Texas state law governing "the validity, revocability, and enforceability of contracts generally" controls the dispute. *Arthur Andersen*, 556 U.S. at 631.

Under Texas law, a party can compel arbitration only by establishing: (1) the existence of a valid agreement to arbitrate; and (2) that the claims asserted by the party attempting to compel arbitration are within the scope of the arbitration agreement. *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.*, 950 S.W.2d 375, 377 (Tex. App.—Tyler 1996, writ dism'd w.o.j). Both the existence issue and scope issue are decided by the court. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.021; *Howell Crude Oil Co. v. Tana Oil & Gas Corp.*, 860 S.W.2d 634, 639 (Tex. App.—Corpus Christi 1993, no writ).

A party seeking to compel arbitration must first show that a valid arbitration agreement exists between the parties, a determination governed by

---

[3] Section 3 of the FAA permits litigants already in federal court to invoke arbitration agreements. 9 U.S.C. § 3. That provision requires courts, "on application of one of the parties," to stay the actions if it involves an issue "referable to arbitration under [the] agreement." *Id.*

traditional state contract principles. *Jody James Farms*, 547 S.W.3d at 631. Under these principles, the court must determine whether an arbitration agreement exists based on the parties' intent as expressed in the terms of the contract. *Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).

The parties' intent controls even when a non-signatory to the arbitration agreement seeks to enforce it. Non-signatories sometimes try to enforce an arbitration agreement against a signatory, who will often respond by arguing that the arbitration agreement exists only between the signatories. When parties dispute whether a "non-signatory can compel arbitration pursuant to an arbitration clause," their dispute "questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *In re Rubiola*, 334 S.W.3d at 224; *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005); *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008).

Although arbitration agreements apply to non-signatories "only in rare circumstances," the question of "[w]ho is actually bound by an arbitration agreement is [ultimately] a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 355, 358 (5th Cir. 2003); *see also In re Rubiola*, 334 S.W.3d at 224 (closely examining an arbitration agreement to determine if a non-signatory could compel arbitration). Courts addressing whether a non-signatory can enforce an arbitration agreement are guided by "'traditional principles' of state law," which "allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen*, 556 U.S. at 631 (holding that "the Sixth Circuit's holding that

nonparties to a contract are categorically barred from § 3 relief was error"); *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) ("[U]nder certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement."). A non-signatory can also enforce an arbitration agreement through subrogation. *See Trefny v. Bear Stearns Secs. Corp.*, 243 B.R. 300, 316 (S.D. Tex. 1999) ("[T]he law is clear that a nonsignatory to an agreement containing an arbitration clause may be treated as bound by the arbitration agreement . . . [through] subrogation."). While parties can select an arbitrator to determine whether their arbitration agreement is valid, courts strongly presume that a judge should resolve the issue, especially when a non-signatory seeks to enforce the arbitration agreement. *Jody James Farms*, 547 S.W.3d at 632 (holding that courts should use a strong "presumption favoring a judicial determination" of whether an arbitration agreement exists).

After proving that a valid arbitration agreement exists, the party seeking to compel arbitration must show that the dispute falls within the scope of the agreement. *Celebrity*, 950 S.W.2d at 378. This question—which can include a question about who decides arbitrability—is one of contract interpretation. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. . . . [A]s with any other contract, the parties' intentions control . . . ."); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." (emphasis in original)). As a contract interpretation issue, a court can only

determine arbitrability by looking to the arbitration clause itself.  *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) ("[A] court must determine whether . . . the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause . . . .").

If the trial court finds that a valid agreement to arbitrate exists and that the claims asserted fall within that agreement, it is required to compel arbitration.  *See Phillips v. ACS Mun. Brokers, Inc.*, 888 S.W.2d 872, 875 (Tex. App.—Dallas 1994, no writ); *Prudential Secs. Inc. v. Banales*, 860 S.W.2d 594, 597 (Tex. App.—Corpus Christi 1993, no writ).  If, on the other hand, the trial court determines that there is no arbitration agreement between the parties, or that no dispute between them falls within the scope of the binding arbitration agreement, the court must deny the motion to compel arbitration with prejudice.  *ASW Allstate Painting & Constr. Co. v. Lexington Inc. Co*, 188 F.3d 307, 311 (5th Cir. 1999).

## B.  The MSA & Ironshore's Subrogation Rights

The MSA is the only contract here that contains an arbitration agreement.  From a high level, the primary issue controlling this dispute is whether the MSA's arbitration agreement is binding between Ironshore and Halliburton.  Ironshore was not a signatory to the MSA, so to prove that an arbitration agreement exists between it and Halliburton, Ironshore must rely on another theory to assert rights under the MSA.  *See Arthur Andersen*, 556 U.S. at 631 (holding that "nonparties to a contract" can enforce an arbitration clause under Section 3 of the FAA if traditional state law principles allow it); *see also In re Rubiola*, 334 S.W.3d at 224 (holding that a dispute over non-signatory enforcement of an arbitration agreement "questions the existence of

a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide."). Ironshore chose subrogation.[4] *See Trefny*, 243 B.R. at 316.

"Subrogation is the substitution of one party for another such that the new party may assert the rights of the substituted party." *Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 85 (5th Cir. 2012). Subrogation rights belong to the subrogated party and are waivable only by the insurer, not the insured. *Austin Indep. School Dist. v. H.C. Beck Partners, Ltd.*, 2009 WL 638189, at \*2 n. 3 (Tex. App.—Austin Mar. 13, 2009, pet. dism'd). Texas courts recognize subrogation rights to their "fullest extent." *Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 141 (Tex. 2008) (quoting *Faires v. Cockrill*, 31 S.W. 190, 194 (1895) (noting that "the courts of no state have gone further" than Texas "in applying the doctrine of subrogation")); *see also Associated Int'l Ins. Co. v. Scottsdale Ins. Co.*, 862 F.3d 508, 509-10 (5th Cir. 2017).

From a lower level, the nub of this dispute is whether Ironshore waived its subrogation rights under the MSA. The MSA states that Statoil will "cause its *insurer* to waive subrogation against [Halliburton] for *liabilities [Statoil] assumes*."[5] The contract clearly requires Statoil to force its insurer to waive subrogation. And a full subrogation waiver would preclude Ironshore from

---

[4] In part of its briefing, Ironshore argues that determining whether Ironshore has subrogation rights is a merits question and, therefore, the district court erred in deciding it. That argument is wrong. This court must determine whether Ironshore has subrogation rights in order to determine whether an arbitration agreement exists.

[5] Ironshore waived subrogation rights in the SPILLS policy it sold to Statoil. But the subrogation waiver only applied "[t]o the extent required by written contract." The only relevant written contract is the MSA, so Ironshore only waived subrogation rights to the extent required by the MSA.

enforcing the arbitration clause.  But Ironshore only waived subrogation if (1) it is an insurer under the MSA and (2) the asserted claim involves a liability that Statoil assumed under the MSA.  If Ironshore shows that either of these elements does not apply, then it retained subrogation rights.

### 1. Is Ironshore an Insurer?

The first element turns on two main provisions.  Under Section 9.1, Statoil agreed that it "[(1)] will cause its insurer to waive subrogation against [Halliburton] for liabilities [Statoil] assumes and [(2)] shall maintain, at [its own] expense, insurance coverage as set forth in Enclosure 2 of the same kind and in the same amount as is required of [Halliburton]."  The primary difficulty with this provision is whether the second clause, beginning with "and shall maintain," modifies the term "insurer."  If it does, then Ironshore does not qualify as an insurer under Section 9.1 simply because it sold Statoil insurance—it must have sold Statoil a particular type of insurance.  Those types of insurance are set forth in the second relevant contract provision, Enclosure 2.

Enclosure 2 sets forth the minimum insurance coverages Statoil must carry.  Those include "Workers' Compensation and Occupational Disease Insurance," "Commercial General Liability Insurance," "Automobile Liability Insurance," "Excess Liability (Umbrella) Insurance," and "All Risk Property Insurance."  (We will call these Enclosure 2 policies.)

The face of the contract and limited record do not shed much light on whether Ironshore qualifies as an "insurer" under the MSA.  But Ironshore points to three main ambiguities to prove that it is not.  First, by using the singular "insurer," rather than the plural "insurers," the contract suggests that Statoil only needed to cause one insurer to waive subrogation rights.

11

Second, if Statoil was required to cause more than one insurer to waive subrogation rights, then another ambiguity arises—whether an "insurer" is one that sells Enclosure 2 policies.  The parties may have intended that only insurers selling an Enclosure 2 insurance policy waive subrogation rights.  For example, the record shows that two other insurers sold Statoil general commercial liability insurance and commercial umbrella insurance, both of which are Enclosure 2 policies.  But there is no record of Ironshore selling a type of Enclosure 2 insurance to Statoil.  The term "insurer" might only include the other two insurers, but not Ironshore.  The record is largely silent on whether Statoil's "insurer" had to be an insurer that offered an Enclosure 2 type of insurance.

Third, the policy between Ironshore and Statoil did not exist until over a year and a half after the MSA became effective.  This timing could suggest that Ironshore was not one of the insurers contemplated when the parties drafted the MSA.

Ultimately, these arguments are not persuasive.  First, Ironshore is clearly an insurer within the normal meaning of the word.  Second, the second phrase, which mentions Enclosure 2, does not appear to modify the term "insurer"—the word "insurer" comes after the verb phrase "will cause," and Enclosure 2 is referenced after a new verb phrase beginning with "shall maintain."  It would be odd for a drafter to intend that a direct object of one verb phrase modify the direct object of an entirely different verb phrase without a clear connection.

Third, the parties seemed to contemplate Statoil maintaining insurance policies from multiple insurers since the contract required multiple types of insurance and Statoil did in fact acquire insurance from multiple insurers.  Fourth, the very same sentence using the singular "insurer" goes on to use the

plural "insurers." Finally, Ironshore's timing argument is undercut by the MSA, which did not require Statoil to acquire its insurance policies before entering the contract. Ironshore has not provided any additional proof that it is not an "insurer" under the MSA. Without a convincing argument or supporting caselaw that it is not an insurer under the MSA, Ironshore has not carried its burden of proving a valid arbitration agreement on this ground.

## 2. *Did Statoil Assume Liability for the Explosion?*

Next is the second element—whether damage from the explosion was a liability that Statoil assumed. Statoil and Halliburton divided up liabilities in four primary places in the MSA. First, in Section 12.8 of the MSA, Statoil agreed to "release, defend, hold harmless and indemnify [Halliburton] against any Claims resulting from any blowout, fire, explosion, cratering or any uncontrolled well condition," "notwithstanding anything contained elsewhere" in the MSA. Statoil, therefore, agreed to assume liability for damages resulting from any fire or explosion.

Section 12.8, however, is "subject to" the second section bearing on Statoil's liabilities, Section 12.1. In Section 12.1, Halliburton agreed to "release [Statoil] of any liability for . . . all Claims of every kind and character . . . arising out of any illness, bodily injury, death or loss or damage to property of any member of [Halliburton]."

The third place where Statoil assumed liability is Section 12.2, which is the mirror image of Section 12.1. In Section 12.2, Statoil agrees to "release [Halliburton] of any liability for . . . all Claims of every kind and character . . . arising out of any illness, bodily injury, death or loss or damage to property of any member of [Statoil]."

13

No. 17-20678
c/w No. 18-20239

A fourth provision further complicates matters.[6]  In Section 12.10, Halliburton agreed to "assume all responsibility for . . . Claims of every kind and character arising from pollution and contamination, which originates above the surface of the land or water from items in the possession or control of anyone within [Halliburton]."  Later in the same section, Statoil agreed to "assume all responsibility for . . . all other pollution or contamination which may occur during or arising from the conduct of Work."

Condensing these four sections, Statoil agreed to assume all liability resulting from a fire or explosion (§ 12.8); Halliburton assumed liability for any claims arising out of damage to its property (§ 12.1); Statoil assumed liability for any claims arising out of damage to its property (§ 12.2); and Halliburton assumed liability for pollution or contamination claims that arise from work or items in Halliburton's possession or control (§ 12.10).  So, putting these sections together, Statoil did not assume liability for damage to Halliburton's property, even if a fire or explosion caused the damage; Statoil assumed liability for all damage to its own property and property of third parties, unless that damage qualifies as pollution or contamination caused by property in Halliburton's possession or control.[7]

---

[6] The district court did not discuss this provision.

[7] The district court held that Section 12.1 controlled over Section 12.8 because Section 12.1 seems to cover nearly all possible harm.  But Section 12.1 only covers "damage to property of any member of [Halliburton]."  It does not say anything about damage to property owned by Statoil or a third party, damage that is covered by Section 12.8.  This limiting language is important because, without it, Section 12.8 is meaningless.  And Texas law requires courts to "read all provisions of an agreement together, interpreting the agreement so as to give each provision its intended effect."  *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, 76 F.3d 89, 91 (5th Cir. 1996) (applying Texas law) (internal citation omitted).

14

No. 17-20678
c/w No. 18-20239

The district court determined that Ironshore made a roughly $12 million payment to Statoil for damage caused by the fire. But the court did not determine whose property was damaged in the fire.[8] Nor did it determine what damage the $12 million payment covered. If Halliburton's property was damaged, then Ironshore did not waive subrogation rights, since Statoil did not assume liability for damage to Halliburton's property. If, however, Statoil's or a third party's property was damaged, then Ironshore did waive its subrogation rights and the claim fell outside of the MSA's arbitration agreement. Without determining what damage Ironshore reimbursed with its roughly $12 million payment, the district court could not determine whether Statoil or Halliburton should be liable for the damage.

The district court also did not determine what kind of damage Ironshore's payment was meant to remediate—pollution, contamination, or otherwise. While the district court stated that the explosion caused "significant environmental damage," it did not relate this statement to Section 12.10. Meanwhile, Ironshore argues, with some support, that the explosion occurred above ground and started with Halliburton's equipment. Ironshore further argues that some of the damage resulted from chemical runoff at the drilling site, which caused environmental harm unrelated to the fire and explosion.[9] If those contentions are true, then Ironshore likely has a strong

---

[8] In one of Ironshore's letters to Halliburton, Ironshore pointed out that Halliburton "was responsible for providing, possessing, and controlling most of the equipment and materials" at the oil rig. The equipment included "over 40 tanks, trucks, totes, and drums," most of which were "compromised in the fire."

[9] In one of Ironshore's letters to Halliburton, it made clear that the EPA observed "uncontrolled runoff of liquids from" the oil rig platform, and this runoff "entered an unnamed tributary . . . which discharges to the Ohio River." The letter also noted other sources of chemical runoff. It is unclear whether all the runoff began before the fire, because of the fire, or during the cleanup operations.

claim that it did not waive subrogation rights to an indemnification claim.  In short, Ironshore waived some subrogation rights, but not all.  The district court's opinion, however, incorrectly held that Ironshore waived them all.

*Ken Petroleum Corporation v. Questor Drilling Corporation* supports this position.  24 S.W.3d 344 (Tex. 2000).  In *Ken Petroleum*, the Supreme Court of Texas addressed a similar subrogation dispute, and the court approached the subrogation waiver clauses with a similarly fine-grained reading, distinguishing between waived and unwaived subrogation rights:

> Sections 13 and 14.9 of the drilling contract require [plaintiff] to cause its insurers to waive their subrogation rights only with regard to [plaintiff's] agreement to indemnify [defendant] for the death of or injury to [plaintiff's] employees and certain others. *The drilling contract does not require [plaintiff] to cause its insurers to waive subrogation rights when they pay amounts that [defendant] should have paid under its agreement to indemnify [plaintiff].* If [plaintiff] is not contractually obligated to [defendant] to enforce a waiver of subrogation, [defendant] cannot insist that [plaintiff] assert a waiver of subrogation when [plaintiff] and the Underwriters both agree that the Underwriters stepped into [plaintiff's] shoes by paying $450,000 to settle the [other] litigation.

*Id.* at 355-56 (emphasis added).

Similarly, in *Exxon Mobil Corp. v. Insurance Company of State*, the insured caused its insurer to waive subrogation rights against the defendant for any bodily injuries sustained by the insured's employees arising out of operations at Texas plants.  No. 17-0200, 2019 WL 638992, at *2 (Tex. Feb. 15, 2019).  The injuries in the case happened to the insured's employees at the defendant's Baytown, Texas plant.  *Id.*  The court went on to hold that the claims at issue fell within the subrogation waiver.  *Id.* at *10.  But the court explicitly noted that the case would have been different if the subrogation waiver were more specific.  *Id.*  If, "for example, [the insured] agreed in a written contract to provide [the defendant] a subrogation waiver for work

performed at a refinery in Dallas," rather than all Texas facilities, the waiver would not cover the claims at issue. *Id.* Like in *Ken Petroleum*, the court distinguished between waived and unwaived subrogation rights. Other cases take a similar view, closely reading subrogation waivers and distinguishing between waived and unwaived rights.[10]

Here, like in *Ken Petroleum* and the hypothetical contract in *Exxon Mobil*, it is unclear that Statoil assumed liability—and therefore was required to cause Ironshore to waive subrogation rights—for *all* damage at the drilling site. Some of the damage might have been to Halliburton's equipment, and some of it might have been environmental. It is therefore possible that Ironshore paid "amounts that [Halliburton] should have paid under its agreement to indemnify [Statoil]." *Ken Petroleum,* 24 S.W.3d at 356. If that is true, then Ironshore should be able to assert subrogation rights under the MSA.

The point is that Ironshore did not waive all of its subrogation rights. Ironshore only waived its subrogation rights to the extent required by the

---

[10] *See, e.g.*, *Liberty Mut. Fire Ins. Co. v. Axis Surplus Ins. Co.*, No. A-16-CA-00870-SS, 2017 WL 6420920, at *6 (W.D. Tex. Dec. 14, 2017) ("[The defendant] seeks to expand [the insurer's] subrogation waiver to all indemnity parties recited in the [contract] regardless of whether [the insured] agreed in writing directly with those parties or whether the indemnity agreement encompasses the underlying insurance claims at issue. The waiver language, however, does not support such an expansive reading, and the Court concludes [the plaintiff] did not waive its subrogation rights against [the defendant] or [the third party] in this case."); *Catlin Specialty Ins., Co. v. L.A. Contractors, Ltd.*, No. CIV.A. H-14-261, 2015 WL 6692221, at *5 (S.D. Tex. Oct. 9, 2015) ("[T]he unambiguous contract language provided that [the insured's] waiver of subrogation is not 'unlimited,' but was instead limited to insuring [the insured's] indemnity obligations. Here, [the insurer] was attempting to enforce [the defendant's] indemnity obligation; [the insured's] indemnity obligation has not been triggered and thus neither has its waiver of subrogation. . . . Because [the insured] did not waive its subrogation rights to enforce [the defendant's] indemnity obligations, [the insurer] has not waived its right to subrogate [the insured's] claims.").

No. 17-20678
c/w No. 18-20239

MSA.  Under the MSA, Ironshore maintained subrogation rights for damages under MSA sections 12.1 for damage to Halliburton's property and 12.10 for environmental damage.  Because the damages here might involve damage to Halliburton's property or environmental damage, and therefore implicate sections 12.1 and 12.10, Ironshore did not waive its subrogation rights.  Critically, this lack of waiver points to the existence of an arbitration agreement.  If Ironshore decides to assert claims not covered by sections 12.1 or 12.10, or it asserts claims for a liability that Statoil did not assume under the MSA, those claims will implicate the scope of the arbitration agreement, not its existence.

We hold that the district court erred.  We therefore REVERSE and hold that there is a binding arbitration agreement between Ironshore, as subrogee, and Halliburton.

## C.  Is This Dispute Arbitrable?

Having determined that there is a valid arbitration agreement between Ironshore, as subrogee, and Halliburton, the next question is whether this dispute—whether Ironshore can enforce its subrogation rights through arbitration—is arbitrable.  *See Jody James Farms*, 547 S.W.3d at 633 (holding that a court must address "whether a valid agreement to arbitrate exists between [a signatory and non-signatory] before any issue may be referred to arbitration").

When a court determines whether a particular dispute falls within the scope of an arbitration provision, it answers a question of "substantive arbitrability, which concern[s] the existence, enforceability and scope of an agreement to arbitrate."  *Swearingen v. Swearingen*, No. 05-15-01199-CV, 2016 WL 3902747, at *4 (Tex. App.—Dallas July 14, 2016) (citing *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 520-21 (Tex. 2015)).

No. 17-20678
c/w No. 18-20239

While questions of substantive arbitrability are usually decided by the trial court, *G.T. Leach Builders*, 458 S.W.3d at 520-21, parties can delegate these questions to the arbitrator, *McGehee v. Bowman*, 339 S.W.3d 820, 825-26 (Tex. App.—Dallas 2011, no pet.).

When determining the scope of an arbitration clause, courts typically "indulge every reasonable presumption in favor of arbitration, and [resolve] all doubts as to the arbitrability of an issue . . . in favor of arbitration." *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.—El Paso 1995, writ dism'd w.o.j.); *see also In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001); *D. Wilson Constr. Co., Inc. v. McAllen ISD*, 848 S.W.2d 226, 231 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.). But that presumption does not govern when the parties dispute who determines arbitrability. In that situation, courts reverse the presumption in favor of arbitration—the "presumption favors adjudication of arbitrability by the courts absent clear and unmistakable evidence of the parties' intent to submit that matter to arbitration." *Jody James Farms*, 547 S.W.3d at 631. Differently put, courts require the party seeking to force arbitration to prove with clear and unmistakable evidence that the parties delegated the arbitrability question to an arbitrator. *See Jody James Farms*, 547 S.W.3d at 631; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019) ("Under our cases, courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" (quoting *First Options*, 514 U.S. at 944 (alterations omitted))).

One way parties can provide such clear and unmistakable evidence of their intent to delegate these issues is by "expressly incorporat[ing] rules empowering the arbitrator to decide substantive arbitrability." *Swearingen*, 2016 WL 3902747, at *4; *see also Saxa Inc. v. DFD Architecture Inc.*, 312

No. 17-20678
c/w No. 18-20239

S.W.3d 224, 230 (Tex. App.—Dallas 2010, pet. denied).  One such rule is Rule 7(a) of the American Arbitration Association's ("AAA") Commercial Arbitration Rules.  Rule 7(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  AAA, Commercial Arbitration Rules and Mediation Procedures, R-7, p.13 (Oct. 2013), https://www.adr.org/sites/default/files/Commercial%20Rules.pdf.  Numerous Texas courts have held that, by incorporating Rule 7(a) into an agreement, parties reached a "clear and unmistakable agreement that the arbitrator would decide its jurisdiction and the arbitrability of any claim or counterclaim concerning disputes between parties who had agreed to arbitrate claims between them."  *Swearingen*, 2016 WL 3902747, at \*4; *see also Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 802-03 (Tex. App.—Houston [1st Dist.] 2011, no pet.).[11]

Another way that parties can provide clear and unmistakable evidence that they intended an arbitrator to decide substantive arbitrability issues is by crafting a broad arbitration clause.  For example, the parties can draft "[a] broad arbitration clause, purporting to cover all claims, disputes, and other matters relating to the contract or its breach, creat[ing] a presumption of

---

[11] *See also Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, No. 13-17-00184-CV, 2017 WL 4054395, at \*4 (Tex. App.—Corpus Christi Sept. 14, 2017) ("[M]any courts—including this Court—have recognized that incorporation of the AAA rules may constitute clear and unmistakable evidence that the parties agreed to commit the question of arbitrability to the arbitrator."); *Jody James Farms, JV v. Altman Grp., Inc.*, 506 S.W.3d 595, 599 (Tex. App.–Amarillo 2016, pet. filed) (collecting federal cases); *In re Rio Grande Xarin II, Ltd.*, No. 13-10-00115-CV, 2010 WL 2697145, at \*8 (Tex. App.—Corpus Christi July 6, 2010) (collecting cases).

No. 17-20678
c/w No. 18-20239

arbitrability." *Am. Realty Tr., Inc. v. JDN Real Estate–McKinney, L.P.*, 74 S.W.3d 527, 531 (Tex. App.—Dallas 2002, pet. denied); *see also Saxa*, 312 S.W.3d at 229-30.

Here, two MSA provisions show that the parties' intended to submit questions of substantive arbitrability to an arbitrator.[12] First, the parties incorporated the AAA's rules, including Rule 7(a), into its arbitration provision. The Rule 7(a) inclusion and arbitration provision here are indistinguishable from those in other cases where courts gave substantive arbitrability questions to the arbitrator.[13] *See, e.g.*, *Super Starr Int'l, LLC*, 2017 WL 4054395, at *4; *Saxa*, 312 S.W.3d at 230. Second, the parties drafted a broad arbitration provision covering "[a]ny controversy between the Parties . . . related to this [MSA] involving the construction or application of any of the

---

[12] Here, the MSA's arbitration provision—Section 13.2—provides that "[a]ny controversy between the Parties . . . related to this [MSA] involving the construction or application of any of the terms, covenants, or conditions of this [MSA] . . . shall . . . be submitted to binding arbitration in Houston, Texas." Section 13.2 further specifies that the American Arbitration Association's ("AAA") "commercial arbitration rules" will govern any disputes.

[13] One wrinkle is that the Texas Supreme Court recently held that Rule 7 only provides clear and unmistakable evidence of the parties' intent to delegate an issue when the signatories to the contract are in a dispute. When a non-signatory is involved, however, incorporating the AAA rules does not provide clear "intent to arbitrate arbitrability." *Jody James Farms*, 547 S.W.3d at 632 ("A contract that is silent on a matter cannot speak to that matter with unmistakable clarity, so an agreement silent about arbitrating claims against non-signatories does not unmistakably mandate arbitration of arbitrability in such cases.").

This holding is inapposite here because the non-signatory, Ironshore, assumed the position of a signatory, Statoil. As noted above, Texas has a robust view of subrogation rights, "allowing the insurer to assert any claims or rights held by the insured against a third party." *Associated Int'l Ins.*, 862 F.3d 508, 510 (5th Cir. 2017) (citing *Mid-Continent Ins. v. Liberty Mut. Ins.*, 236 S.W.3d 765, 774 (Tex. 2007)). Courts have even allowed non-signatories with subrogation rights to reform contracts. *Id.* Because Ironshore did not waive its subrogation rights, it now stands in the position of a signatory to the contract.

No. 17-20678
c/w No. 18-20239

terms, covenants, or conditions." Like in other cases, this language suggests that the parties intended to submit substantive arbitrability issues to an arbitrator. *See, e.g.*, *Am. Realty Tr.*, 74 S.W.3d at 531.

We hold that Ironshore has produced clear and unmistakable evidence that Statoil and Halliburton agreed to submit issues of substantive arbitrability, which include this dispute, to the arbitrator.[14] We therefore REMAND to the district court to stay the case pending arbitration.

### III.  The District Court's Personal Jurisdiction Ruling

After ruling on Ironshore's arbitration motion, the court turned to Ironshore's motion to dismiss for lack of personal jurisdiction. The court granted the motion, holding that it did not have specific jurisdiction over Ironshore because Ironshore lacked minimum contacts with the forum state. We agree.

### A.  Background Personal Jurisdiction Law

This court reviews de novo a district court's decision to grant a motion to dismiss for lack of personal jurisdiction. *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 591 (5th Cir. 2003). Because the district court granted Ironshore's motion to dismiss "without holding an evidentiary hearing, [we] must accept as true the uncontroverted allegations in the complaint and resolve in favor of [Halliburton] any factual conflicts." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). While Halliburton bears the burden of

---

[14] The arbitrability of the underlying merits dispute is not at issue in this case. The only issues are (1) whether an arbitration agreement exists between Ironshore and Halliburton and (2) whether Statoil and Halliburton intended an arbitrator to determine substantive arbitrability questions. The merits of the dispute, as articulated in Ironshore's motion to stay, concern several questions related to the MSA, including whether Halliburton is "obligated to indemnify Ironshore" and "whether Statoil is obligated to indemnify Halliburton," as well as other MSA-related questions. The court need not address whether these fall within the arbitration agreement's scope.

proving personal jurisdiction, it need only present a prima facie case of personal jurisdiction to satisfy that burden. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000). "Proof by a preponderance of the evidence is not required." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (internal citation omitted).

A "federal court sitting in diversity may assert jurisdiction if (1) the state's long-arm statute" allows it; and (2) exercising jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment. *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir. 1989). Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry reduces to only the federal due process analysis. *Johnston*, 523 F.3d at 609.

Federal due process requires a plaintiff to prove two things. First, the plaintiff must show that the non-resident defendant "purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008) (internal citation omitted). Second, the plaintiff must show that the "exercise of jurisdiction . . . does not offend traditional notions of fair play and substantial justice." *Id.* (internal citation omitted).

"There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction," which is not at issue here. *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Specific jurisdiction applies when a non-resident defendant "has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001) (internal citation omitted).

No. 17-20678
c/w No. 18-20239

## B. Personal Jurisdiction over Ironshore

Halliburton argues that three sets of facts establish Ironshore's minimum contacts with the state of Texas. First, Ironshore voluntarily pursued forum-state litigation by seeking to draw Halliburton into the initial Texas lawsuit filed by Statoil. Second, Ironshore seeks to assert subrogated rights against Halliburton under the MSA. Third, Ironshore sold the SPILLS policy to Statoil, a Texas resident. We will address these three arguments in turn.

### 1. *Participating in State-Court Litigation*

Four facts are relevant to analyzing this argument. First, Ironshore participated, as a defendant, in a Texas state court action with Statoil's other insurers and attempted to involve Halliburton. Second, Ironshore attempted to arbitrate in Texas with Halliburton. Third, Ironshore sent letters threatening to invoke the benefits of Texas arbitration. Finally, Ironshore settled the litigation with Statoil's insurers, and the settlement agreement included a forum selection clause with Texas as the forum state. Ultimately, Halliburton's arguments are unconvincing.

### a. *Ironshore's Participation in Texas Litigation*

This court has long held that a non-resident defendant may participate in litigation without submitting to the court's jurisdiction so long as it maintains its objection to personal jurisdiction. *PaineWebber Inc.*, 260 F.3d at 461. Relatedly, this court has also held that filing a counterclaim or "third-party claim does not, without more, waive an objection to personal jurisdiction."[15] *Id.*; *see also Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d

---

[15] This rule has one exception: "When a defendant seeks to bring into an action new claims against new parties, such as counterclaims, cross-claims, or third-party claims, and

No. 17-20678
c/w No. 18-20239

1147, 1149 (5th Cir. 1987) (holding that "the filing of a counterclaim, cross-claim, or third-party demand does not operate as a waiver of an objection to jurisdiction"). This rule makes sense. Prior to the current rule, non-resident defendants could accidentally waive their personal jurisdiction defense by litigating the merits of their case too ardently—defendants had to exhaust all potential jurisdictional defects before addressing the merits. *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 874 (3d Cir. 1944) (holding that a defendant "is no longer required at the door of the federal courthouse to intone that ancient abracadabra of the law, *de bene esse*, in order by its magic power to enable himself to remain outside even while he steps within . . . [and] may now enter openly in full confidence that he will not thereby be giving up any keys to the courthouse door which he possessed before he came in"). Rule 12(b) reversed these results, allowing a non-resident defendant "to simultaneously protest personal jurisdiction while vigorously advocating the merits of his case." *Toshiba Int'l Corp. v. Fritz*, 993 F. Supp. 571, 573-74 (S.D. Tex. 1998).

Here, Ironshore never initiated an original action in Texas, which would have subjected it to personal jurisdiction. Ironshore participated as a defendant in the only two relevant actions: the action initiated by Statoil's insurers and this action initiated by Halliburton. In both actions, Ironshore continuously objected to the court's personal jurisdiction. While it did file a counterclaim in the insurer action and sought to involve Halliburton—though

---

*these claims do not arise out of the same transaction or occurrence as the original action*, the attempted joinder constitutes a waiver of personal jurisdiction defense." 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1067.3 (4th ed. 2018) (emphasis added). This case does not implicate this exception because (1) Ironshore never officially filed a third-party claim and (2) even if it had, the claim would arise out of the same transaction or occurrence as the original action.

it did not file an official third-party claim—as discussed above, counterclaims and third-party claims do not subject non-resident defendants to jurisdiction.[16]

b. *Ironshore's Attempts to Arbitrate*

Ironshore's efforts to force arbitration do not change this analysis.  This court has definitively held that a defendant's "agreement to arbitrate in Texas does not necessarily constitute consent to the personal jurisdiction of Texas courts to adjudicate its claims in the first instance." *Int'l Energy Ventures*, 818 F.3d at 212.  When a party agrees to arbitrate, it subjects itself to the court's jurisdiction for "the limited purpose of compelling arbitration."  *Id.* (quoting *Armstrong v. Assocs. Int'l Holdings Corp.*, 242 F. App'x 955, 957 (5th Cir. 2007) (unpublished) (per curiam)); *see also Encompass Power Servs. v. Eng'g & Constr. Co.*, 224 F. App'x 329, 331 (5th Cir. 2007) (unpublished) (per curiam).

Here, Ironshore submitted to the court's jurisdiction for the sole purpose of compelling arbitration.  By submitting to the court's power for this limited purpose and maintaining its personal jurisdiction motion to dismiss, Ironshore continued to object to "the power of the court" and did not waive its personal jurisdiction defense.  *PaineWebber*, 260 F.3d at 460.

Nor does an agreement to arbitrate necessarily provide minimum contacts with the arbitration forum.  In *International Energy*, this court further held that an agreement to arbitrate also did not provide sufficient minimum contacts where the defendant, much like here, (1) "did not negotiate

---

[16] Although the above cases discuss waiver, rather than minimum contacts, responding to a lawsuit is not the type of purposeful availment required to find minimum contacts. *Dell Mktg., L.P. v. Incompass IT, Inc.*, 771 F. Supp. 2d 648, 655-56 (W.D. Tex. 2011) ("Although these cases refer to waiver rather than minimum contacts, asserting counterclaims when one has already been sued is hardly the sort of purposeful availment that gives rise to personal jurisdiction.").  Holding otherwise would also undercut the purposes of Rule 12(b).  Practically, holding that filing a third-party claim results in purposeful availment is no different than holding that filing a third-party claim results in waiver.

No. 17-20678
c/w No. 18-20239

the agreement in Texas, (2) . . . did not travel to Texas because of that agreement, and (3) the unwritten agreement did not require performance in Texas." 818 F.3d at 213. Notably, the defendant in that case was a party to the agreement at issue, unlike here, where Ironshore was not a party to the MSA.[17]

*c. Ironshore's Demand Letters to Halliburton*

Ironshore's letters to Halliburton also fail to confer personal jurisdiction. Many other circuits have addressed similar scenarios in which a potential plaintiff sends a cease-and-desist letter threatening litigation to a potential defendant. None of these courts held that sending a letter amounts to purposeful availment.[18] In-circuit district courts have reached the same

---

[17] In our own research, we found two cases in which district courts imputed the actions of an insured party to the subrogee-insurer for personal jurisdiction purposes. *In re M/V MSC FLAMINIA*, 107 F. Supp. 3d 313, 322 (S.D.N.Y. 2015) (holding that "a court may impute an insured's actions to the insurer when the insurer has paid the insured for a loss" in assessing the insurer's minimum contacts with the forum state because the insurer, as subrogee, is the real party in interest); *Compl. of Kreta Shipping, S.A.*, No. 96 CV. 1137 KMW, 1997 WL 115428, at *4 (S.D.N.Y. Mar. 14, 1997) (holding "that the real party in interest behind a claimant appearing in this Court for a limitation proceeding must also be considered to have appeared in this Court"). We find these out-of-circuit district court opinions unpersuasive for two reasons. First, the Supreme Court has made clear that the non-resident defendant's actions—not those of another party—are relevant for assessing minimum contacts. Second, when assessing principal-agent relationships, this court has held that the actions of a principal are not necessarily attributable to an agent, even though the actions of the agent can be attributed to the principal. *See McFadin v. Gerber*, 587 F.3d 753, 761 (5th Cir. 2009) (holding that "the actions of an agent may establish minimum contacts over a principal" but requiring the plaintiff to show an agency relationship).

[18] *See e.g.*, *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458-59 (Fed. Cir. 1997) (holding that "sending infringement letters, without more activity in a forum state, is not sufficient to satisfy the requirements of due process"); *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) ("It is difficult to characterize [defendant's] letter alleging infringement in an unspecified locale and threatening litigation in an unspecified forum as an activity invoking the 'benefits and protection of New York law.'"); *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 196-97 (1st Cir. 1980) (holding that the mere sending of an infringement letter into the forum state is not enough to confer jurisdiction); *Cascade Corp. v. Hiab–Foco AB*, 619 F.2d 36, 38 (9th Cir. 1980) (holding that letters from defendant claiming

27

conclusion.[19]  Ironshore's letters, even if they threatened litigation, are not enough to show minimum contacts with Texas.[20]

*d.  Ironshore's Settlement Agreement & Forum Selection Clause*

The final fact Halliburton highlights in favor of personal jurisdiction is a forum selection clause that specifies Harris County as the desired forum for future litigation.  The clause is located in the settlement agreement Ironshore entered to end its prior litigation with Statoil's insurers.

Choice-of-law provisions and forum-selection clauses are relevant to this minimum-contacts analysis, but they are not dispositive.  *See Pervasive Software v. Lexware GmbH & Co. KG*, 688 F.3d 214, 223 (5th Cir. 2012) (internal citation omitted); *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391,

---

patent infringement were not enough to invoke personal jurisdiction under Oregon long-arm statute because to do so would offend traditional notions of fair play and substantial justice).

[19] *See e.g.*, *Xtera Communs., Inc. v. TPACK A/S*, 2010 WL 4118803, at *3 (E.D. Tex. Sept. 1, 2010) (dismissing claim for declaratory relief for lack of personal jurisdiction because "demands for payment sent to Texas were the result of the unilateral action of the plaintiffs"); *Stroman Realty, Inc. v. Grillo*, No. CIV.A. H-05-2066, 2006 WL 492458, at *4 (S.D. Tex. Feb. 28, 2006) ("[T]he cease and desist letter-which was sent to Stroman after the Secretary received a complaint from an Illinois citizen who had a seller-client relationship with Stroman-is an insufficient basis for conferring specific jurisdiction."); *DNH, LLC v. In-N-Out Burgers*, 381 F. Supp. 2d 559,564 (E.D. La. 2005) (noting that courts have repeatedly held that cease-and-desist letters are insufficient to confer specific personal jurisdiction in patent and copyright cases because principles of fair play and substantial justice afford a party latitude to inform others of its rights without subjecting itself to suit in a foreign forum) (citing cases); *Thousand Trails, Inc. v. Foxwood Hill Prop. Owners Ass'n*, 1999 WL 172322, at *3 (N.D. Tex. Mar. 22, 1999) ("[T]he vast majority of the courts have held that the nonresident defendant's action in sending a demand letter to the plaintiff is insufficient to create personal jurisdiction.").

[20] Halliburton's cited cases do not help.  In *Interpole*, the party challenging personal jurisdiction filed its own lawsuit in the forum state.  940 F.2d at 21.  *Mitrano* involved a second lawsuit in which the former plaintiff later contested personal jurisdiction.  *Mitrano*, 377 F.3d 402, 407 (4th Cir. 2004).

395 (S.D. Tex. 2011). Halliburton must still satisfy the standard minimum-contacts analysis.

As noted above and below, Ironshore has virtually no connections to the state other than as a defendant in litigation. There are no allegations of suit-related contact between Ironshore and Texas other than Ironshore's participation as a defendant in litigation and the forum-selection clause in the settlement agreement; the conduct underlying that suit, as well as this one, occurred outside the forum state; this suit does not arise under the settlement agreement; and the settlement agreement did not shift Ironshore from defendant to plaintiff—it simply released Statoil from the litigation. And Ironshore still participates as a defendant. *See Hazim v. Schiel & Denver Pub. Ltd.*, No. CIV-A-H-12-1286, 2015 WL 4545534, at *7 (S.D. Tex. July 28, 2015) (finding no personal jurisdiction, despite a forum selection clause, because the defendant had few if any other contacts with the forum state).

### 2. Asserting Subrogated Rights

Halliburton next argues that Ironshore has minimum contacts with Texas based on the MSA. According to Halliburton, two facts support this argument. First, the MSA is a Texas-centric contract. Second, Ironshore attempted to assert subrogated rights to binding arbitration under the MSA.

Halliburton's first argument is unconvincing for two basic reasons. First, a non-resident defendant can only develop minimum contacts with a forum state through "actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. at 223). Second, as a general matter, courts must assess each defendant's contacts with the forum state individually—a substantial connection is not

formed by the "unilateral activity of another party or a third person." *Id.* (internal citation omitted).

Here, Ironshore was not a party to the MSA, had no connection to the MSA, and never agreed to be bound by the MSA. The MSA, therefore, does not bear on Ironshore's contacts with the state. Nor can Statoil's contacts be imputed to Ironshore. While this court has imputed the contacts of one party to another,[21] it has not done so in a scenario where the non-resident defendant is so detached from the contract in dispute. Nor has any other court. *See, e.g.*, *Allied Prof'ls Ins. Co. v. Harmon*, No. 8:16-CV-1864-JLS-KESX, 2017 WL 5634861, at \*4 (C.D. Cal. Mar. 7, 2017) (holding that "the contacts of a contracting party are not imputed to an assignee or third-party beneficiary under a minimum contacts analysis").

Halliburton's second argument is also unconvincing because, as noted above, a party's decision to submit to arbitration in the forum state does not result in either (1) minimum contacts or (2) waiver of the personal jurisdiction defense.

### 3. *Insurance Contract with a Texas Resident*

Halliburton next argues that Ironshore has minimum contacts with the state of Texas because (1) it sold the SPILLS policy to Statoil, a Texas resident and (2) Ironshore is subject to Texas regulation as a lines insurer.

---

[21] This court has held that courts can impute forum contacts of a predecessor company to the successor corporation, but only because the successor corporation is a "mere continuation" of the predecessor. *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002). It has also held that courts can attribute the authorized actions of an agent to the principal. *McFadin*, 587 F.3d at 761 (holding that "the actions of an agent may establish minimum contacts over a principal" but requiring the plaintiff to show an agency relationship). Halliburton has not argued, and the record does not show, that such a close relationship, like successor-predecessor companies or principal-agent, exists here.

No. 17-20678
c/w No. 18-20239

The first argument is not persuasive.  The Supreme Court has long held that "an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478; *see also Gulf Coast Bank & Tr. Co. v. Designed Conveyor Sys., L.L.C.*, 717 F. App'x 394, 399 (5th Cir. 2017) (unpublished) (per curiam).  So Statoil being a Texas resident does not, on its own, establish minimum contacts between Ironshore and Texas.

Nor does the SPILLS policy establish minimum contacts under the test developed in *Burger King*.  That test requires courts to evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum." *Gulf Coast Bank*, 717 F. App'x at 399 (internal citation omitted).  None of these factors cut in favor of Halliburton.

The parties negotiated the SPILLS policy in Oklahoma.  Ironshore underwrote the policy in Louisiana.  Ironshore did not underwrite any policies in Texas.  A surplus lines broker in Oklahoma procured the policy.  And the policy is governed by New York law and provides for dispute resolution in New York.

This case falls far below other cases in which courts found insufficient minimum contacts.  *See, e.g.*, *Int'l Energy Ventures*, 818 F.3d at 213 (finding no minimum contacts where "(1) [the defendant] did not negotiate the agreement in Texas, (2) [it] did not travel to Texas because of that agreement, and (3) the unwritten agreement did not require performance in Texas"); *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004) ("[T]he combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and

the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant.").[22]

Halliburton's second argument is also unconvincing. Texas's decision to regulate the lines insurance market has nothing to do with Ironshore's minimum contacts with Texas. A state's decision to regulate an industry is relevant to the second prong of the personal jurisdiction test: whether the assertion of personal jurisdiction would comport with "fair play and substantial justice."[23] And courts only reach this prong after establishing the defendant's minimum contacts with the forum state. While it is true that "[t]hese considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required," *Burger King*, 471 U.S. at 477, they cannot overcome the baseline rule that "an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts," *id.* at 478.

---

[22] *See also Freudensprung*, 379 F.3d at 345 ("The significance of these alleged minimum contacts is severely diminished by the fact that the contract at issue specified that it was to be governed by English law and that the material portions of the contract, which contemplated the supply of personnel to WWAI for its projects in West Africa, were to be performed in West Africa, not Texas."); *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (discussing relevance of contract's choice-of-law provision and place of performance to minimum contacts analysis).

[23] When making the "fair play and substantial justice" assessment, courts look to a variety of factors, one of which is "the forum State's interest in adjudicating the dispute." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). This court has previously held that state regulation of the insurance industry shows the state's interest in adjudicating disputes related to that industry. *Burstein v. State Bar of Cal.*, 693 F.2d 511, 519, 522 (5th Cir. 1982) (distinguishing the Supreme Court's approval of personal jurisdiction over the out-of-state insurance company in *McGee*, 355 U.S. 220, in part by explaining that insurance transactions are highly state regulated, and thus states have a particularly strong interest in resident victims of insurance fraud).

No. 17-20678
c/w No. 18-20239

We therefore AFFIRM and hold the district court was correct in concluding that Ironshore lacks minimum contacts with Texas and dismissing Halliburton's breach of contract claims.

## IV. Conclusion

For appeal No. 17-20678, we REVERSE the district court's decision that Ironshore waived all of its subrogation rights under the MSA. We REVERSE the district court's decision that Ironshore, as subrogee, and Halliburton do not have a binding arbitration agreement. As a result, we REMAND for the district court to stay the case pending arbitration.

For appeal No. 18-20239, we AFFIRM the district court's decision that it lacked personal jurisdiction over Ironshore for the remaining breach of contract claims.