# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
August 28, 2020

Lyle W. Cayce
Clerk

No. 18-60896

BRADLEY STUBBLEFIELD; KRISTAN STUBBLEFIELD,

> Plaintiffs—Appellants

v.

SUZUKI MOTOR CORPORATION, a foreign corporation; NISSIN KOGYO COMPANY, LTD, a limited liability company,

> Defendants—Appellees

consolidated with

No. 19-60812

BRADLEY STUBBLEFIELD; KRISTAN STUBBLEFIELD,

> Plaintiffs—Appellants

v.

SUZUKI MOTOR CORPORATION, a foreign corporation,

> Defendant—Appellee

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 3:15-CV-18

No. 18-60896
c/w No. 19-60812

Before HIGGINBOTHAM, STEWART, and ENGELHARDT, Circuit Judges.

PER CURIAM:[*]

Having suffered an adverse jury verdict in this products liability personal injury lawsuit, Plaintiffs—Appellants Bradley and Kristan Stubblefield (hereinafter, "the Stubblefields") appeal a number of rulings regarding evidence admissibility, juror selection, and personal jurisdiction. The Stubblefields also appeal the district court's post-judgment award of $38,543.64 in costs to Defendant-Appellee Suzuki Motor Corporation ("Suzuki"). Finding no reversible error, we AFFIRM.

I.

This products liability action arises from a motorcycle accident that occurred on January 12, 2012, in Canton, Mississippi. Specifically, Plaintiff—Appellant Bradley Stubblefield ("Brad") alleges that, while riding his 2006 Suzuki GSX R1000 motorcycle to work, as he typically did, the bike's front braking system suddenly and unexpectedly failed, causing him to be unable to stop. After crossing over a 132-foot concrete gore[1] and another lane of traffic, the motorcycle plunged down a grassy embankment, crashing into the ravine below. The bike fell on top of Brad, severing his spinal cord. Brad's injuries have rendered him permanently paralyzed from the chest down.

In January 2015, contending the motorcycle's front brake master cylinder (hereinafter referred to as "FBMC") was defective and caused Brad's accident, the Stubblefields filed this suit against Suzuki Motor of America, Inc., and Suzuki Motor Corporation, as the manufacturer of the motorcycle, and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] A "gore" is defined as "a small usually triangular piece of land." *See* "gore." *Merriam-Webster.com*. 2020. https://www.merriam-webster.com/dictionary/gore. (2 July 2020).

No. 18-60896
c/w No. 19-60812

Nissin Kogyo Co., LTD ("Nissin"), the manufacturer of component parts of the FBMC.[2] On March 23, 2018, the district court found personal jurisdiction over Nissin lacking and dismissed it from the action. In doing so, the court rejected the Stubblefields' contention that Nissin had waived any personal jurisdiction objection by litigating for almost two years before filing, on March 17, 2017, the motion to dismiss for lack of personal jurisdiction that then remained under advisement for a year.

After a five-week trial in the United States District Court for the Southern District of Mississippi, Northern Division, the jury returned a verdict in favor of Suzuki on December 7, 2018.[3] The jury, responding to special verdict questions, was asked to answer "yes" or "no" as to whether the evidence presented at trial established the following elements of the Stubblefields' design defect claim:

> (1) On September 3, 2005, when the motorcycle left Suzuki's control, Suzuki knew or, in the light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger of brake failure that is alleged to have caused Brad Stubblefield's crash;
>
> (2) Brad used the front brake on January 12, 2012, and the front brake failed to function as expected;
>
> (3) On September 3, 2005, when the motorcycle left Suzuki's control, a feasible alternative design existed that would to a reasonable probability have prevented the crash without impairing the utility, usefulness, practicality or desirability of the motorcycle;

---

[2] Defendant Suzuki Motor of America, Inc., was dismissed prior to trial.

[3] Trial began in early November 2018. Near the end of the trial, before closing arguments were made, the Stubblefields withdrew their manufacturing defect and failure to warn claims, leaving only the design defect claim for jury determination.

No. 18-60896
c/w No. 19-60812

(4) A defective condition rendered the motorcycle unreasonably dangerous for Brad to use;

(5) Brad was harmed by the motorcycle; and

(6) A defective and unreasonably dangerous design of the motorcycle proximately caused Brad's damages.

For the Stubblefields to have prevailed against Suzuki at trial, the jury had to provide affirmative responses to all six elements. Instead, the jury answered "no" to all of them. Thus, the jury found that the Stubblefields failed to establish even one of the six elements necessary to prevail, under Mississippi law, on their design defect claim.

Following entry of judgment, the Stubblefields filed their December 31, 2018 notice of appeal. They challenge multiple evidentiary rulings of the trial court, arguing the errors had the cumulative effect of depriving them of a fair trial against Suzuki. The Stubblefields also appeal Nissin's dismissal, contending the district court erred in finding that Nissin had not waived its personal jurisdiction defense. Additionally, during the course of the first appeal, the trial court ordered the Stubblefields to pay $38,543.64 in costs to Suzuki. Upon the Stubblefields' October 24, 2019 appeal of the September 29, 2019 order, the two appeals were consolidated for consideration by this panel.

II.

Focusing first on Nissin, we consider whether the trial court erred in dismissing Nissin for lack of personal jurisdiction rather than finding that it had waived the objection by participating in the litigation. A district court's ruling on personal jurisdiction is reviewed de novo. *Ham v. La Cienega Music Co.* 4 F.3d 413, 415 (5th Cir. 1993). However, when facts underlying the jurisdictional determination are disputed, the district court's factual findings are reviewed only for clear error. *DeJoria v. Maghreb Petroleum Expl., S.A.,*

4

No. 18-60896
c/w No. 19-60812

935 F.3d 381, 390 (5th Cir. 2019) ("Even when an appellate court considers a legal question de novo, that plenary power of review does not extend to subsidiary factual findings."), *cert. denied,* No. 19-789, 2020 WL 1978947 (U.S. Apr. 27, 2020); *Pederson v. La. State Univ.,* 213 F.3d 858, 869 (5th Cir. 2000) (resolutions of factual dispute are overturned only if clearly erroneous); *Loumar, Inc. v. Smith,* 698 F.2d 759, 763 (5th Cir. 1983).

Brad lives in Mississippi. His motorcycle, however, was never sold or purchased in Mississippi. Originally titled in Florida, the bike subsequently was purchased, in 2008, by John Mojtabaee, in Georgia. Mojitabaee bought the motorcycle, after it was repossessed from its original Florida owner, from Accu-Car Expo, Inc. In May 2010, Brad traveled from Mississippi to Georgia to purchase the used motorcycle from Mojitabaee, whom Brad had located on Craigslist. Brad personally transported the motorcycle from Georgia to Mississippi, which already had been driven for 8,000 miles, before its first entry into Mississippi.

The district record does not reflect any dispute relative to Nissin's foreign (Japan) manufacturing location and the absence of any actions by it to direct or market its products to Mississippi. Nissin manufactures FBMCs and other brake components in accordance with its customers' purchase orders, plans, specifications, and instructions. Following manufacture in Japan, Nissin delivers its FBMCs as uninstalled parts to its manufacturing customers. Once the parts are delivered to its various customers, Nissin has no control over the FBMCs or other brake components, including where they may be installed in vehicles, or where any vehicles that may contain the component parts are ultimately shipped, distributed, sold, or re-sold.

Instead, its products—component parts—are manufactured for and delivered only to foreign buyers. Indeed, given the bike's initial purchase by a

No. 18-60896
c/w No. 19-60812

Florida resident, the only apparent nexus between the bike in question and the state of Mississippi is *Brad's* decision to buy the bike—second-hand—from a Georgia resident who had advertised it on Craigslist. On these facts, a finding of no personal jurisdiction over Nissin is easily supported. Thus, on appeal, the real question is whether Nissin waived its right to object by participating in the litigation.

In challenging the district court's "no waiver" ruling, the Stubblefields understandably complain that their suit was pending for two years before Nissin filed its motion to dismiss on March 17, 2017, and that, in the interim, Nissin participated in discovery and filed a demand for trial by jury. Nevertheless, this court has recognized that Federal Rule of Civil Procedure 12(b) allows a "non-resident defendant 'to simultaneously protest personal jurisdiction while vigorously advocating the merits of his case.'" *Halliburton Energy Servs., Inc. v. Ironshore Specialty,* 921 F.3d 522 (5th Cir. 2019) (quoting *Toshiba Int'l Corp. v. Fritz,* 993 F. Supp. 571, 573–74 (S.D. Tex. 1998)). Here, Nissin denied the existence of personal jurisdiction in its first Rule 12 filing— its answer—and reiterated that objection in the March 2017 status report required by the district court.

Furthermore, the two years prior to the filing date of Nissin's motion to dismiss included a five-month stay, a delay associated with the parties' efforts to negotiate a protective order, multiple extensions of discovery deadlines, and the district court's entry of a new scheduling order, in December 2016, setting a November 2017 trial date and new pre-trial deadlines. At no time did Nissin seek affirmative relief sufficient to submit itself to the court's jurisdiction. Finally, when Nissin filed its motion to dismiss, the deadline for amendment of pleadings was a month away, the discovery deadline was five months away,

No. 18-60896
c/w No. 19-60812

and the dispositive motion deadline was six months away. On this showing, affirmance of the district court's dismissal order is warranted.

III.

Turning next to the Stubblefields' claims against the motorcycle manufacturer, Suzuki, we note again that Brad has alleged that his January 12, 2012 accident occurred during the course of his usual morning ride to work when the front braking system on his motorcycle suddenly and unexpectedly failed, causing him to be unable to stop. The motorcycle crossed over a 132-foot concrete gore, and another lane of traffic, before plunging down a grassy embankment and crashing into the ravine below.

The cause of the accident could not be definitively determined from the available evidence and was hotly contested at trial. On the day of the accident, Brad was immediately taken by ambulance to the emergency room of University of Mississippi Medical Center. There, he was placed in a medically induced coma and, upon awakening in the ICU a week later, remembered nothing about the day of the accident or his interim hospital stay. Rather, his last memory prior to awakening in the hospital is riding the motorcycle home from work the night before the accident.

Initially, Brad and his family assumed the accident was caused by a patch of gravel along the outer edge of the roadway in which Brad was traveling prior to the accident. Despite the memory loss rendering him unable to actually recall the events, Brad, on October 14, 2012, explained the crash, in an online forum for motorcycle enthusiasts, as follows:

> Back in January, I was on my way to work when I came across some gravel mid corner. There was too much to avoid so I had to stand the bike up, hit the brakes, and slide off the road into the grass (no big deal

7

right?).  I ended up going down an embankment and landing on my left side at impact.[4]

After Brad's accident, his wife, Kristan Stubblefield ("Kristan") created an online blog regarding the event and his injuries. In her first entry, dated May 19, 2012, she likewise blamed the crash on roadway gravel: "My husband was on his way to work, just like every other day, when he hit a patch of gravel on his motorcycle. Brad had to straighten the bike out and ended up riding down an embankment."

Thereafter, on November 18, 2013, Suzuki issued a Safety Recall of the front brake master cylinder of GSX-R motorcycles for the model years 2004–2013. The Safety Recall Notice states, in pertinent part:

**IMPORTANT SAFETY RECALL**

This Notice Applies to Your Motorcycle VIN XXXXXXXXXXXXXXXX

November 18, 2013

Dear Suzuki Owner:

This notice is sent to you in accordance with the requirements of the National Traffic and Motor Vehicle Safety Act. Suzuki Motor Corporation has decided that a defect which relates to motor vehicle safety exists in 2004-2013 GSX-R600, 2004-2013 GSX-R750 and 2005-2013 GXX-R1000 Suzuki motorcycles.

**What is the problem?**

After a long service life of the motorcycle without changing the brake fluid, the brake fluid can

---

[4] In the same post, Brad said his father rode the motorcycle after the crash "to make sure the motor, brakes, suspension, steering, etc., still work like they used to and [his father said that he] couldn't tell a difference." In a June 3, 2013 post, Brad described the motorcycle's post-crash condition: "There is no damage to the frame, motor, suspension, steering, wheels, brakes, clutch, exhaust, etc."

No. 18-60896
c/w No. 19-60812

deteriorate and absorb moisture. The brake piston inside the front brake master cylinder of some motorcycles may not have uniform surface treatment. This combination of conditions can lead to corrosion of the brake piston. Corrosion of the brake piston generates gas, which may not be adequately purged from the master cylinder due to the side position location of the reservoir port. Gas remaining in the master cylinder can affect braking power by reducing proper fluid pressure transmission to the front brake. Over time, as gas continues to slowly accumulate above the reservoir port, the front brake lever may develop a "spongy" feel and stopping distances may be extended, increasing the risk of a crash.

For your safety and customer satisfaction we are initiating a safety recall campaign to replace the affected front brake master cylinder.

---

**WARNING**

**Operating your motorcycle without having the recall service performed may increase the risk of a crash.**

**To minimize the risk of a crash, do not ride or allow anyone else to ride your motorcycle until this recall service has been completed.**

---

### What is Suzuki doing to solve the problem?

Your dealer will replace the front brake master cylinder. The redesigned master cylinder has the reservoir port located at the top to allow better purging of gas and a uniform surface treatment on the master cylinder piston. Your dealer will also flush the brake hydraulic system of old brake fluid. The brake hydraulic system will then be refilled with fresh brake fluid and bled to remove any air from the system. This procedure will take approximately 2 hours to

No. 18-60896
c/w No. 19-60812

> complete.  Parts are available now, and there will be
> no charge to you for any recall service-related parts or
> labor.

Upon learning of Suzuki's November 2013 Safety Recall, Kristan and Brad's father, Dan, reportedly recalled comments and a hand motion that Brad allegedly had made in the hospital emergency room on the day of the accident. Specifically, the Stubblefields contend, Brad told Kristan and Dan: "front brake, front brake," while, at the same time, clenching his right hand as if squeezing something (as if referring to the manner in which a motorcycle's front hand brake is used). At that point, they reconsidered their previous assumptions regarding the cause of the accident. Indeed, in a January 9, 2014 blog post, Kristan states: "Forget the former things . . .," referencing "new information about Brad's accident."

Suzuki attributes Kristan's January 9, 2014 statement regarding the accident to its November 18, 2013 Safety Recall. It also emphasizes that Kristan had not previously referenced "Brad's alleged 'front brakes' statements in the hospital" in her blog.

In any event, the Stubblefields filed suit in January 2015, contending the FBMC on Brad's motorcycle suffered the same defect identified in the November 2013 Safety Recall and had caused the January 2012 accident.  At the November 2018 trial, the Stubblefields argued that Brad crossed over the concrete gore, before crashing down the grassy ravine, because the car in front of him (driven by Karen Richmond) unexpectedly slowed, requiring him to also slow to avoid hitting her.  Then, when Brad's front brake did not "work right," he tried to avoid her on the left where, because there was gravel, he appropriately applied his rear brake (as evidenced by the skid mark in the

gravel), but not his front brake, until he was atop the gore.[5] Once there, Brad argues, he, an experienced rider, absolutely would have used his front brake as he traversed the gore, but it failed, causing him to go down in the ravine where he crashed with the motorcycle on top of him.

Suzuki, on the other hand, argues that Brad was never in the lane behind Ms. Richmond. Rather, having unsuccessfully tried to pass her while entering the single lane ramp, Brad knew that he could not use his front brake in the gravel, so he steered on the gore, where, Suzuki argues, "there's no evidence of any attempt to use that [front] brake" on the gore "to lock up the front brake," or any evidence of use of the rear brake. Indeed, Suzuki contends that "with the rear brake only, he could have stopped onto the gore." Instead, Suzuki maintains, once out of the gravel and on the gore, Brad "had choices," and given his "thousands of hours of off-road [riding] experience," likely decided his best option "was to ride into the grass that was in front of him," slowing down there, prior to returning to the roadway, "[not] realizing or fully appreciating how steep the ravine was." In support of its theory, Suzuki cites Brad's aforementioned October 2012 post-accident forum post, describing his going off-road as "having to slide off the road into the grass. No big deal. Right? [until going down the embankment]."

As set forth above, the jury, responding to special verdict questions, determined that the Stubblefields had failed to establish any of the required elements of their design defect claim. Appealing the adverse verdict, the Stubblefields raise the following issues:

---

[5] According to the parties' submissions, it is undisputed that use of the *front* brake should be avoided in gravel if possible because of associated safety concerns.

No. 18-60896
c/w No. 19-60812

Issue 1:   Did the district court err in excluding Suzuki's Product Recall Notice from evidence pursuant to Federal Rule of Evidence 407 and Federal Rule of Evidence 403?

Issue 2:   Did the district court err in interrupting the Stubblefields' cross-examination of Suzuki expert Todd Hoover for the weekend to allow him to review his testimony from a prior trial and then excluding the testimony from evidence?

Issue 3:   Did the district court err in excluding from evidence testimony by Kristan (Brad's wife) and Dan (Brad's father) regarding statements and hand gestures allegedly made by Brad in the emergency room shortly after the accident?

Issue 4:   Did the district court err in failing to remove two jurors who may have openly discussed the case before the trial began?

Issue 5:   Did the district court err in admitting character evidence of Brad's driving, in the form of blog posts written by Brad in a GSX-R riders' forum?

Issue 6:   Did the district court err in excluding from evidence all of Suzuki's customer complaints of front brake problems resulting in loss of braking ability, nine other accidents resulting in lawsuits, and all investigation documents, which all involved Suzuki GSX-R motorcycles with the front brake design identical to Brad's?

Because it concerns jury selection, rather than the evidentiary determinations challenged in the Stubblefields' other assertions of error against Suzuki, we begin our analysis with Issue No. 4, and then continue with the remainder.

**Issue on Appeal No. 4 – Jury Selection Ruling**

In Issue No. 4, the Stubblefields contend the trial court erred in failing to remove two jurors who may have openly discussed the case before the trial began. Potential jurors should be excused for cause if his or her "'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *United States v. Ross,* 367 F.

12

No. 18-60896
c/w No. 19-60812

App'x 519, 524 (5th Cir. 2010) (quoting *Soria v. Johnson,* 207 F.3d 232, 242 (5th Cir. 2000)). The party seeking to exclude a juror because of bias bears the burden of demonstrating partiality. *Wainwright v. Witt,* 469 U.S. 412, 423 (1985). "We review a district court's ruling on a prospective juror's impartiality for manifest abuse of discretion." *United States v. Wharton,* 320 F.3d 526, 535 (5th Cir. 2003); *United States v. Munoz,* 15 F.3d 395, 397 (5th Cir. 1994).

The trial transcript reveals that the district court thoroughly investigated the Stubblefields' negative assertions and confirmed, on the record, that the two jurors understood that the jury's verdict must rest solely on the evidence—not sympathy, other emotion, or any biases—and that they were capable of satisfying that duty. The district judge also confirmed that the two jurors understood that they were not to discuss the case until their deliberations at the end of trial. On this record, we find no abuse of discretion in the district court's decision to retain these jurors.

### Issues on Appeal Nos. 1, 2, 3, 5 and 6 – Evidentiary Rulings

Issue Nos. 1, 2, 3, 5 and 6 challenge evidentiary rulings germane to questions that the jury was asked regarding the elements of a products liability defective design claim, *i.e.,* whether Brad used the front brake, whether it failed, whether brake failure caused the accident, whether the brake was defective and unreasonably dangerous at the time that it left Suzuki's control in September 2005, whether Suzuki knew or should have known of the danger at that time, and whether a feasible design alternative that would have prevented the harm also existed at that time.

Regarding this query, the Stubblefields' briefs include the following synopsis of their position vis-à-vis the district court's treatment of their design defect claim against Suzuki:

No. 18-60896
c/w No. 19-60812

The exclusion of the investigation documents, the exclusion of the customer complaints, and the exclusion of the Safety Recall notice misled the jury into believing that Brad's front brake failure was a unique, isolated event. This error also served to buttress Suzuki's narrative that Brad's accident was solely the result of Brad's dangerous driving and improper maintenance, rather than Suzuki's mechanical failure. "This wholesale, blanket exclusion of evidence led to some obviously artificial and unreasonable results." *Jackson,* 788 F.2d at 1084. These errors substantially prejudiced Plaintiffs by depriving them of their right to a fair trial.

For the Stubblefields to have prevailed at trial, the jury would have had to provide affirmative responses to all six of the verdict form questions set forth above. Instead, the jury answered all of them in the negative. Thus, in order to prevail on appeal, the Stubblefields must establish reversible error sufficient to invalidate the entirety of the jury verdict—either considering it as a whole or as to each of the six individual elements of their design defect claim.

Before addressing the Stubblefields' evidentiary challenges seriatim, we pause to emphasize certain points guiding our analysis. To start, this appeal follows a full 19-day jury trial resulting in a unanimous jury verdict in Suzuki's favor. Furthermore, we review the district court's evidentiary rulings for abuse of discretion. *Wallace v. Andeavor Corp.,* 916 F.3d 423, 428 (5th Cir. 2019) (citations omitted). "A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)). Importantly, "[t]his standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case

No. 18-60896
c/w No. 19-60812

differently." *Anderson*, 470 U.S. at 573. Finally, in order to vacate a judgment based on an error in an evidentiary ruling, "this court must find that the substantial rights of the parties were affected." *Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 370 (5th Cir. 2000) (quoting *Carter v. Massey-Ferguson, Inc.,* 716 F.2d 344 (5th Cir. 1983).

As indicated above, the first element of the Stubblefields' products liability claim is whether Suzuki knew or should have known, in 2005, when the motorcycle left its control, about the danger of brake failure that is alleged to have caused Brad's motorcycle accident. Issue on Appeal No. 6, concerning so-called "OSIs" (other similar incidents) is relevant to this first element.

### Issue on Appeal No. 6 – Other Similar Incidents

At trial, the Stubblefields attempted to introduce evidence of "customer complaints," and "other similar incidents" involving motorcycle accidents, as well as post-accident investigation documents leading to the November 2013 recall, to support their assertion that Suzuki had had the requisite notice required by Mississippi law. The district court's rejection of this evidence for that purpose, however, falls within the scope of its discretion. In reaching this conclusion, we note that much of the evidence in question involved incidents that occurred after 2005 (the year that Suzuki introduced this bike into commerce), incidents for which the applicable date was not apparent, and/or incidents that were not sufficiently similar, and thus lacked relevance. Certainly, another judge, tasked with addressing this evidentiary dispute in the first instance, might permissibly conclude that a portion of the proffered evidence should be admitted into evidence, rather than excluded. In that scenario, the parties' focus would shift to debating the proper weight of the evidence, utilizing witness testimony, vigorous cross-examination, and argument. That possibility, however, does not govern our appellate review.

No. 18-60896
c/w No. 19-60812

Rather, the scope of our review is properly limited by the applicable abuse of discretion standard.

On this point, the Stubblefields argue little more than "everyone in the world knows that brake components can corrode under the wrong situation, like the zinc/steel galvanic connection," which gives off hydrogen gas. They do not point to pertinent expert testimony or admissible trial evidence demonstrating that Suzuki either knew or should have known, when Brad's bike left its control in 2005, that its FBMC design would yield sufficient levels of corrosion, and/or resulting trapped gas, to cause front brake failure even if the brake fluid were changed as directed by the manufacturer.[6]

The district court also was tasked with determining evidentiary disputes relevant to the second, third, fourth, fifth, and sixth elements of the Stubblefields' design defect claim. Those determinations are presented for appellate review by Issues on Appeal Nos. 1, 2, 3, and 5.

---

[6] Suzuki's brief describes the alleged design defect as follows:

> First, a zinc piston in the FBMC contacted a steel return spring, allegedly creating a galvanic couple that corroded the piston, disrupted a seal in the FBMC, and impaired brake performance. The corrosion also allegedly created hydrogen gas in the FBMC, reducing fluid power transmission to the front brake, and further interfering with the brake's performance.
>
> Second, locating a reservoir return port on the side of the FBMC, rather than the top, prevented hydrogen gas from escaping, also interfering with braking performance.

A "galvanic couple" is a pair of dissimilar substances (such as metals) capable of acting together as an electric source when brought in contact with an electrolyte. *See* "galvanic couple." *Merriam-Webster.com.* 2020. https://www.merriam-webster.com/dictionary/galvanic%20couple (2 July 2020).

16

No. 18-60896
c/w No. 19-60812

## Issue on Appeal No. 1 – Product Recall Notice

Issue No. 1 concerns whether the district court erred in excluding Suzuki's November 2013 Product Recall notice pursuant to Federal Rule of Evidence 407, regarding subsequent remedial measures,[7] and Federal Rule of Evidence 403.[8] The Stubblefields maintain that the safety recall notice is relevant to the second, third, fourth, fifth, and sixth elements of their claim. Specifically, they contend that the recall should have been admitted as evidence of causation, for impeachment, and to demonstrate that a feasible alternative design existed when the motorcycle left Suzuki's control, in 2005, that would, to a reasonable probability, have prevented the crash.

Pertinent to this inquiry, the parties have disputed the ongoing validity and impact of *Brazos River Auth. v. GE Ionics, Inc.* 469 F.3d 416 (5th Cir. 2006), and *Rutledge v. Harley-Davidson Motor Co.*, 364 F. App'x 103, 106 n.4 (5th Cir. 2010), regarding use of such evidence to prove causation and impeachment. Based on these cases, Suzuki has argued, and the district court agreed, that

[7] Federal Rule of Evidence 407 (Subsequent Remedial Measures) states:

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

[8] Federal Rule of Evidence 403 provides:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

No. 18-60896
c/w No. 19-60812

Federal Rule of Evidence 407, as amended in 1997, disallows use of such evidence to prove causation, and for impeachment, when doing so would allow the evidence to be used in proving a defect.  In support of Suzuki's position, its counsel, at oral argument, additionally cited *Hardy v. Chemetron Corp.*, 870 F.2d 1007, 1011 (5th Cir. 1989) ("[e]vidence of subsequent measures is no more admissible to rebut a claim of non-negligence than it is to prove negligence directly"). In response, the Stubblefields continue to argue that their proposed use of the recall notice falls outside Rule 407's exclusionary boundaries.

Given the record before us, it us unnecessary for us to parse the fine points of these arguments.  As Suzuki has emphasized, the recall, as written, is not applicable because it addresses conditions occurring *only* when the brake fluid of a motorcycle with a long service life has not been changed timely.  In this instance, it is undisputed that Brad *had* changed his brake fluid within the recommended time frame. Furthermore, regarding impeachment, when the expert witness statements at issue are read carefully, in context, and with attention to detail, it is apparent that they actually are *not* contrary to the information set forth in the recall.

Finally, regarding possible use of the recall notice to establish that a feasible alternative design existed when the motorcycle left Suzuki's control, that would, to a reasonable probability, have prevented the crash, the district court determined such use was likewise impermissible under Mississippi law. This conclusion rests on the Stubblefields' expert's opinion that using the substitute FBMC provided with the recall would *not* "to a reasonable probability have prevented the crash."

On this point, the Stubblefields' expert, Jeffrey Hyatt, opined that the *primary* cause of the crash was corrosion (in the form of a gel substance) rather than the hydrogen gas resulting from that corrosion.  Because the post-recall

18

No. 18-60896
c/w No. 19-60812

FBMC maintained the design (a zinc piston directly contacting a steel spring) that Hyatt opined would have created corrosion, having the port at the top of the FBMC (as did the post-recall FBMC) to better vent the gas would only *lessen* the chances of, *not prevent*, the crash. Based on this reasoning, the "feasible alternative design" exception to Rule 407 would not be triggered. Thus, we find no abuse of discretion in the district court's decision precluding the admission of the recall notice and post-recall FBMC.

### Issue on Appeal No. 2 – Hoover Testimony

Issue No. 2 concerns the district court's weekend interruption of the Stubblefields' examination of Suzuki expert Todd Hoover so that Hoover could first review prior testimony, but then excluding the entirety of that testimony. Hoover's previous testimony concerned the reason for which the FBMC was replaced on Hoover's personal motorcycle. The Stubblefields' examination of Hoover did not resume the following Monday, however, because, in the interim, the district court decided the prior testimony would not be allowed since it would reference, or elicit a reference to, the excluded recall notice. Because the panel has found no abuse of discretion regarding the district court's exclusion of Suzuki's November 18, 2013 recall notice, we likewise find no reversible error in interrupting, and then excluding from evidence, prior testimony that would have included a reference to, and most likely discussion of, the banned recall notice.

### Issue on Appeal No. 3 – Hearsay in the ER

Issue No. 3 concerns Brad's alleged emergency room "front brake, front brake" statements and hand gesture (as if he were attempting to squeeze his motorcycle's front brake) about which his father and wife unsuccessfully sought to testify. Given Brad's inability to remember the day of his accident, this excluded testimony is relevant to the second element of the Stubblefields'

19

No. 18-60896
c/w No. 19-60812

claim, i.e., Brad's alleged attempted "use" of his front brake and its "failure" on the day of the accident. Despite the Stubblefields' arguments for the application of either the "excited utterance" hearsay exception provided by Federal Rule of Evidence 803(2), the "dying declaration" exception provided by Federal Rule of Evidence 804(b)(2), or the "residual hearsay exception" provided by Federal Rule of Evidence 807(a), the district court's rejection of this evidence is likewise well within the scope of its discretion.[9]

---

[9] Federal Rule of Evidence 803(2) (Hearsay Exceptions) states:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .
>
> (2) **Excited Utterance.** A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

Federal Rule of Evidence Exception 804(b) states:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> . . .
>
> (2) **Statement Under Belief of Imminent Death**. In a prosecution for homicide or in a civil case, a statement that the declarant, while believing the declarant's death to be imminent made about its cause or circumstance.

Federal Rule of Evidence 807(a)(Residual Exception) states:

> (a) **In General.** Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>     (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

No. 18-60896
c/w No. 19-60812

Notably, *both* Brad's father (Dan) and wife (Kristan) purportedly failed to remember and/or mention Brad's emergency room "front brake" statements and hand gesture until almost two years later, after they learned of Suzuki's November 18, 2013 recall of its FBMC.  They also apparently failed to question Brad (or any of the first responders/health care providers) while in the emergency room regarding his unclear statements, and have not shown that the comments were made in response to particular questions asked by anyone there. One reasonably could question the likelihood of these circumstances, given that all of these persons, then present in the emergency room, presumably would have some significant interest in knowing what had happened.

Furthermore, the district judge could reasonably doubt that Dan, an experienced motorcycle rider of many years, who had helped Brad select the wrecked motorcycle, would leave the hospital to retrieve the bike for safekeeping, and then ride and examine the bike to ascertain its condition, but *not* promptly investigate, or even remember, for almost two years, the cryptic message that his severely injured son reportedly struggled to convey about the bike's front brake upon arriving at the emergency room. Certainly, some delay in recollection and investigation is understandable given the tragedy of Brad's injuries and the resulting major impact on his and his family's lives. Nevertheless, given the totality of the circumstances, the district court

---

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

21

reasonably concluded the proffered emergency room evidence lacked the necessary indicia of reliability.

Lastly, the "dying declaration" hearsay exception applies only when a declarant's state of mind is such that death is thought to be imminent. Here, whereas Brad's injuries undisputedly were serious, nothing in the record supports an inference that, while in the emergency room, he thought that he was about to die. Although Kristan testified that *she* inquired whether Brad "would make it" and was thankful that he was alive, despite his paralysis, neither point is sufficiently indicative of *Brad's* state of mind to require that the evidence in question be admitted.

### **Issue on Appeal No. 5 – Brad's Pre-Accident Blog Posts**

Issue No. 5 challenges the district court's pre-trial denial of the Stubblefields' motion in limine seeking to exclude any testimony that Brad was a "careless, reckless, or aggressive motorcycle driver," reasoning any such proof "is highly probative" of the first and second elements of the design defect claim—whether he attempted to "use" his front brake and whether the brake failed to perform as expected. At trial, the district court, citing Federal Rule of Evidence 406, regarding evidence of a "habit or preferred behavior," admitted into evidence five pre-accident posts written by Brad in a GSX-R riders' forum, between March 14, 2011 and July 27, 2011, over the Stubblefields' objections asserted under Federal Rules of Evidence 404(b)(1) and 403.[10] The posts at issue state:

---

[10] Federal Rule of Evidence 406 (Habit; Routine Practice) states:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless

No. 18-60896
c/w No. 19-60812

Exhibit D-475-1: "I wanted a bike I could ride every day while still hitting the twisties out in the country on the weekends . . . the bike is also a beast up top and in the twisties so it was perfect for me." (posted on May 19, 2011).

Exhibit D-475-4: "During the week, I ride about 15 miles each way to work and back on the interstate. I stay around 80mph." (posted on May 19, 2011).

Exhibit D-475-6: In response to a thread started by another, asking the question "**What pisses you off?**" Brad posted the following: "People pulling out in front of me so late that the only option is to pass them somehow, even if it requires splitting the middle lane or going off road. It's either that or smashing into them, time to brake is not an option. People driving under the speed limit." (posted on March 14, 2011).

Exhibit D-477-5: "I'm intentionally doing a wheelie, I let off the gas then give it about ½ throttle." (posted on June 10, 2011).

Exhibit D-477-7: "My goal for this bike was comfort . . . and speed (back country roads/mountains)" (posted on July 27, 2011).

Considering the record at hand and the parties' submissions, we conclude the district court's admission of these statements was a reasonable exercise of its discretion or, even if error, not reversible error. The posts provide

---

of whether it is corroborated or whether there was an eyewitness.

Federal Rule of Evidence 404(b) (Character Evidence; Crimes or Other Acts) states:
. . .

**(b) Crimes, Wrongs, or Other Acts.**
    **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

No. 18-60896
c/w No. 19-60812

some insight into Brad's pre-accident riding habits and preferences, including the possibility of riding off-road in circumstances where he would lack sufficient time to brake because of another driver's actions. Furthermore, witness testimony, argument by counsel, and, if warranted, instructions from the court were available to address the appropriate weight to be given and/or any applicable limitations to be applied.

IV.

Following the district court's entry of final judgment on the jury's verdict, Suzuki submitted a bill of costs, as a prevailing party, pursuant to 28 U.S.C. § 1920 and Rule 54 of the Federal Rules of Civil Procedure.  The Stubblefields filed a motion objecting to the bill of costs and the district court denied the Stubblefields' motion. The Stubblefields appeal the $38,543.64 cost award rendered in Suzuki's favor.

The Federal Rules of Civil Procedure explicitly permit the prevailing party at trial to recover costs.  Rule 54 states: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees— should be allowed to the prevailing party."  FED. R. CIV. P. 54(d)(1).  Thus, taxable costs are presumptively awarded to the prevailing party. *Moore v. CITGO Ref. & Chem. Co., L.P.*, 735 F.3d 309, 320 (5th Cir. 2013). The denial of costs requires the trial court to "articulat[e] some good reason for doing so." *Schwarz v. Folloder*, 767 F.2d 125, 131 (5th Cir. 1985). Nevertheless, the word "should" in § 1920 "makes clear that the decision whether to award costs ultimately lies within the sound discretion of the district court." *Marx v. Gen. Revenue Corp.*, 566 U.S. 371, 377 (2013) (internal quotations omitted).  "Because the Rule authorizes the district court to deny the award, we review that exercise of authority for abuse of discretion." *Pacheco v. Mineta,* 448 F.3d 783, 793 (5th Cir. 2006).  The district court's award of costs

24

No. 18-60896
c/w No. 19-60812

will only be reversed upon a clear showing of an abuse of that discretion. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1049 (5th Cir. 1998). "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Nunez v. Allstate Ins. Co.,* 605 F.3d 840, 844 (5th Cir. 2010).

Categories of recoverable costs are set forth in 28 U.S.C. § 1920, which provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title; and
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
>
> A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920. *See also Gaddis v. United States*, 381 F.3d 444, 455–56 (5th Cir. 2004) (deposition transcripts and private service fees recoverable under 28 U.S.C. § 1920); *Holmes v. Cessna Aircraft Co.*, 11 F.3d 63, 64–65 (5th Cir. 1994) (daily transcripts and witness fees, including travel fees, recoverable by prevailing party); *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales,* 729 F.2d

No. 18-60896
c/w No. 19-60812

1530, 1552–53 (5th Cir. 1984) (permitting fees for witness who did not testify given another witness' last-minute decision not to testify).

Here, Suzuki sought, and was awarded the following:

(1) Fees for service of summons and subpoena - $113.61

(2) Fees for printed deposition transcripts - $15,658.40

(3) Fees for daily trial transcripts - $19,884.85

(4) Fees for witnesses - $2,886.78

**Total: $38,543.64**

On appeal, the Stubblefields contend that the district court abused its discretion in awarding costs, and further abused its discretion in refusing to reduce the amount of costs awarded.

Beginning with their assertion that we should not affirm the award of costs, the Stubblefields argue the following: (1) that they possess limited financial resources; (2) that Suzuki perpetrated misconduct during the litigation; (3) that the lawsuit featured close and difficult legal issues; (4) that the litigation conferred a substantial benefit to the public; and (5) that the prevailing party has enormous financial resources. Certain specific items of expenses also are challenged on independent grounds: the costs for independent process servers are unreasonable; the transcripts were not necessarily obtained in preparation for litigation; the daily transcript fees were unreasonable; and the witness fees for two non-testifying witnesses are unjustified.

The district court found the Stubblefields improperly relied upon *Pacheco v. Mineta*, 448 F.3d 783 (5th Cir. 2011), for their position that the case required the court to assess certain enumerated factors in deciding whether to deny an award of costs. Nevertheless, the district court analyzed the Stubblefields' two arguments under this standard and found neither sufficed

26

to overcome the presumption of awarding costs to SMC as the prevailing party. The district court then addressed each category of costs sought by Suzuki and challenged by the Stubblefields, finding no basis to reduce the amount awarded.

We find no abuse of discretion in the district court's determination of the Stubblefields' challenge to Suzuki's cost award. At the outset, we again emphasize that the applicable query is not whether another judge would have rendered the same ruling.  Rather, it is whether the district court charged with this discretionary duty abused that discretion. In this instance, we are particularly mindful of the district court's necessary familiarity with the record in this case, having considered several weighty motions and presided over a 19-day trial presenting numerous evidentiary battles.

 We begin with the smaller fees in dispute: the summons/subpoena fees and the witness fees for persons who ultimately did not testify.  We find no error in the district court's assessment that private process fees are recoverable and that witness fees were warranted for witnesses who were present and prepared to testify.

The most substantial costs challenged are those for deposition transcripts ($15,884.85) and daily trial transcripts ($19,885.85).  "[I]t is not required that a deposition actually be introduced in evidence for it to be necessary for a case—as long as there is a reasonable expectation that the deposition may be used for trial preparation, it may be included in costs." *Stearns Airport Equip. Co., Inc. v. FMC Corp.,* 170 F.3d 518, 536 (5th Cir. 1999). The parties' submissions reflect that the depositions at issue were either of the Stubblefields, eyewitnesses, first responders, damage witnesses, or expert witnesses.  Many of the deponents were witnesses at trial or were on a "may call" witness list for trial. Otherwise, the transcripts were used in a

motion, or relied upon by experts in confecting opinions formulated in preparation for trial. On this showing, we cannot fault the district court's determination that all of the depositions at issue were necessarily obtained for use in the case and most of the deposition transcripts were in fact used at trial.

To award the cost of daily transcripts, the court must find that they were not "obtained primarily for the convenience" of the parties but were "necessarily obtained for use in this case." *Brumely Estate v. Iowa Beef Processors, Inc.,* 704 F.2d 1362, 1363 (5th Cir.1983). In applying this rule, courts generally have considered the "length of the trial, the complexity of the issues, whether a daily transcript was necessary to minimize disagreement over the testimony of witnesses, and whether proposed findings of fact were required." *Graves for and on Behalf of W.A.G. v. Toyota Motor Corp.,* No. 2:09CV169KS-MTP, 2012 WL 13018892, at *3 (S.D. Miss. Apr. 27, 2012); *see also Holmes v. Cessna Aircraft Co.,* 11 F.3d 63, 64 (5th Cir. 1994) (finding district court's award of daily transcript costs appropriate where transcripts necessary to a successful verdict); *Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207, 1226 (11th Cir. 2002) (proper to award costs of daily trial transcripts due to length and complexity of trial).

Here, the district court reasoned that the jury trial lasted 19 days over a five-week period of time encompassing both the Veterans Day and Thanksgiving Day court holidays. Further, the district court issued various evidentiary rulings in oral form that were only encapsulated within the transcript, and the parties were required to rely upon such to make evidentiary objections and answers to objections. Additionally, Suzuki used the daily transcripts within its various motions filed during the pendency of the jury trial, in a trial brief filed during its case-in-chief, and in its closing argument. And, in at least one instance, one of the Stubblefields' expert witnesses utilized

No. 18-60896
c/w No. 19-60812

the daily transcript of another witness, in an attempt to modify his opinion. Expert witnesses also used the transcripts to stay fully apprised of the witness testimony.

Based on the foregoing, we are satisfied by the district court's finding that daily transcripts were not "obtained primarily for the convenience" of the parties but were "necessarily obtained for use in this case." As recently noted by this court: "Appellate court deference to district court factfinding is grounded in concerns of both expertise and efficiency." *DeJoria,* 935 F.3d at 391. "District court judges, who do the lion's share of the work in our federal system, do not dig through voluminous records only to have courts like this one restart the factfinding from scratch." *Anderson,* 470 U.S. at 574. "Instead of redoing their work, we defer to their findings so long as they take a permissible view of the evidence." *DeJoria*, 935 F.3d at 391.

V.

As stated herein, we find no reversible error in the district court rulings challenged on appeal.  Accordingly, we AFFIRM.